# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| JIMMY RUIZ HEREDIA and EDGAR EMMANUEL SERRANO MONDRAGON, individually and on behalf of all others similarly situated | ) ) ) ) ) | CIVIL ACTION FILE NO. _____ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| SEWON AMERICA, INC., and TOTAL EMPLOYEE SOLUTION SUPPORT, LLC | ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

1.     This case involves fraud, discrimination, and wage violations against foreign workers who were exploited as part of an illegal scheme for cheap labor in the automotive manufacturing facility operated by Defendant Sewon America, Inc. ("Sewon") in Lagrange, Georgia. Plaintiffs are professional engineers from Mexico who were promised professional-level engineering jobs that would qualify for the "Trade NAFTA" or "TN" visa program but were instead lured to the U.S. to perform non-qualifying manual labor under discriminatory and unsafe working conditions. Plaintiffs seek relief for themselves and a class of similarly situated victims.

## NATURE OF THE CASE

2.     This case involves fraud, discrimination, and wage violations against foreign workers who were exploited as part of an illegal scheme for cheap labor in the automotive manufacturing facility operated by Sewon in LaGrange, Georgia.

3.     Sewon associated with the recruitment and staffing agency Defendant Total Employee Support Solutions ("TESS") for the common purpose of recruiting Plaintiffs and other foreign professionals to secure nonimmigrant "Trade NAFTA" or "TN" visas and work for them as manual laborers at the Sewon facility.

4.     Defendants knew that TN visas would not and could not be granted for the manual labor positions that Sewon wanted filled because TN visas are only available to professional-level foreign workers for professional level jobs that require specialized education and experience.

5.     Defendants therefore hatched a scheme to recruit highly skilled Mexican engineers and technicians for non-existent professional-level positions that would qualify for the TN visa program.

6.     The plan was a bait and switch accomplished by fraud against the foreign workers and the U.S. government which consisted of hiring the Mexican engineers and technicians for non-existent engineer and technician jobs; assisting these engineers and technicians with securing the TN visas by submitting fraudulent documents to the U.S. government; and when the foreign workers

arrived to the United States, showing them that the real job is a manual labor job with lower and discriminatory pay and unsafe working conditions.

7.     Plaintiffs and other Mexican engineers and technicians were victims of this scheme because they relied upon Defendants' misrepresentations and so spent money for fraudulent visas, to travel to the U.S. Consulate for interviews, and move from Mexico to the U.S. for jobs they reasonably believed qualified for the TN visa and would utilize their specialized education, experience, and skills.

8.     Defendants' conduct violated the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO") statute.

9.     Sewon also failed to pay minimum wages and overtime wages based on the regular rate of pay, in violation of the Fair Labor Standards Act ("FLSA").

10.     Sewon also discriminated against Plaintiffs and other similarly situated Mexican engineers on the basis of their race in violation of 42 U.S.C. § 1981.  To be clear, this claim is not based on Plaintiffs' immigration status.

11.     Sewon also breached contracts of employment with Plaintiffs and other similarly situated workers.

12.     Plaintiffs, on behalf of themselves and the Class (as defined below), seek unpaid wages, liquidated damages, and attorneys' fees and costs of litigation for Sewon's violations of the FLSA; compensatory and punitive damages and attorney's fees and costs of litigation for all Defendants' violations of Georgia RICO; punitive damages for Sewon's violation of 42 U.S.C. § 1981; and

3

consequential, incidental, and/or nominal damages, and attorneys' fees and costs for contract breaches by Sewon.

## THE PARTIES

13.     Plaintiffs and putative class members are citizens and nationals of Mexico, non-citizens of the United States, and Hispanic persons of Mexican ancestry.

14.     Plaintiffs and putative class members came to the U.S. on a TN visa to work for Sewon.

15.     Plaintiffs reside in Georgia and subject themselves to the jurisdiction of this Court.

16.     Sewon is a Georgia limited liability company with its principal place of business at 1000 Sewon Boulevard, LaGrange, Georgia 30240.

17.     Sewon is a subsidiary of the Sewon Technology Co., Ltd., one of the affiliated companies of South Korea's Sewon Group.

18.     Sewon operates an automotive parts manufacturing plant in LaGrange, Georgia.

19.     For over 13 years, Sewon has supplied auto body modules to automotive companies operating in the U.S. such as Hyundai and Kia Motors, KMMG, HMMA, Mobis Georgia, Mobis Alabama, and Unipres.

20.     Sewon is also in the process of opening a new manufacturing facility in Effingham County, Georgia where it plans to create over 700 new jobs.

21.    TESS is a Georgia domestic limited liability company, with its principal place of business at 2430 Green Mountain Dr., Braselton, Georgia 30517.

22.    TESS is a labor recruitment company that recruits foreign national workers to work for companies in the U.S., including Sewon.

23.    At all relevant times, Plaintiffs and other similarly situated employees were each a "person" within the meaning of that term as defined by the Georgia RICO. *See* O.C.G.A. § 16-14-6(c).

24.    At all relevant times, each Plaintiff was an "employee" of Sewon and was employed by Sewon within the meaning of the FLSA.

25.    At all relevant times, each Plaintiff was a party to an employment contract with Sewon within the meaning of 42 U.S.C. § 1981 and the common law of Georgia.

26.    Junho "Nathan" Jung is listed as Sewon's Secretary and Chief Financial Officer with the Georgia Secretary of State.

27.    Mr. Jung additionally held himself out as Sewon's General Manager on job offer letters from Sewon and in Support Letters submitted by Sewon to the Plaintiffs and others similarly situated and the U.S. government.

28.    At all relevant times, each Defendant was a "person" within the meaning of Georgia RICO as that term is used in O.C.G.A. § 16-14-4.

29.    At all relevant times, Sewon was an "employer" of the Plaintiffs as that term is defined by the FLSA.

30.    Sewon also engages in commerce or in the production of goods for commerce.

31.    Sewon has a gross volume of sales made or business done of not less than $500,000 per year.

## JURISDICTION AND VENUE

32.    This Court has subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331 and § 1332.

33.    The Court has pendent jurisdiction over Plaintiffs' state law claims because they are part of the same case or controversy as their federal claims. 28 U.S.C. § 1367.

34.    The Court has personal jurisdiction over Defendants because they reside in Georgia.

35.    Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c), as well as 18 U.S.C. § 1965(a).

## STATEMENT OF FACTS

*The TN visa Program*

36.    The North American Free Trade Agreement ("NAFTA"), which came into force on January 1, 1994, created a special trade relationship between the United States, Mexico, and Canada. *See generally,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

37.    The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexican and Canadian professionals in certain occupations ("TN profession") to temporarily enter the United States for employment within their profession. *See* 8 C.F.R. § 214.6(a).

38.    Engineer and Scientific Technician/Technologist are among the categories of professionals permitted entry into the United States with TN visas. *See* 8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the NAFTA).

39.    A Mexican citizen applying for a TN visa:

must present documentation sufficient to satisfy the consular officer … that the applicant is seeking entry to the United States to engage in business activities for a United States employer(s) or entity(ies) at a professional level, and that the applicant meets the criteria to perform at such a professional level. This documentation may be in the form of a letter from the prospective employer(s) in the United States or from the foreign employer, and must be supported by diplomas, degrees or membership in a professional organization…The documentation shall fully affirm:

(A)    The [TN] profession of the applicant;

(B)    A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity;

(C)    The anticipated length of stay;

(D)    The educational qualifications or appropriate credentials which demonstrate that the … Mexican citizen has professional level status; and

(E)   The arrangements for remuneration for services to be rendered.

8 C.F.R. § 214.6(d)(3)(ii).

40.   The TN visa applicant "must engage in a prearranged business activity at a professional level for a U.S. or foreign employer." 9 F.A.M. § 402.17-5(A).

41.   Once an applicant has provided the required evidence set forth in the preceding paragraph, the applicant is admitted under the TN visa classification for a period of up to three years. *See* 8 C.F.R. § 214.6(e).

42.   The TN visa is tied to the associated employer for the duration of the TN visa period unless a new employer submits a verified petition to USCIS seeking to add or change employers. 8 C.F.R. § 214.6(i)(1) (the new employer must file a Form I-129, Petition for Nonimmigrant Worker).

43.   Since 1997, the number of TN visas issued has increased significantly every year, except for 2020 due to the COVID-19 pandemic. For example, in 1997, 287 TN visas were issued to Mexican nationals. By 2007, the number had increased to 4,060.[1] In 2017, it had grown to 15,993 visas.[2]

---

[1] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf
[2] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf

44.     In 2021, 24,881 TN visas were issued to Mexican nationals.[3]

45.     Government oversight of TN visa holders' working conditions in the United States is limited. As a consequence, there have been multiple reports of abuses—including misrepresentations in employment contracts—of TN workers,[4] as well as several lawsuits.[5]

### Defendants' Fraudulent Scheme

46.     Sewon began operating in Georgia in 2008.

47.     "According to Nathan Jung, who worked for Kia in Seol before moving to the United States, 'in Korea, the the union is such a big headache for the employers, and they're always asking something more." In contrast, the South was attractive because it was 'union-free.'" Minchin, Timothy J., *When Kia Came to Georgia: Southern Transplants and the Growth of America's 'Other' Automakers,"* THE JOURNAL OF SOUTHERN HISTORY, Vol. 83, No. 4, 2017, pp. 916 n. 67, *available at* http://www.jstor.org/stable/44784061 (last visited Mar. 11, 2024).

---

[3] *See* Nonimmigrant Visas Issuances by Visa Class and Nationality, U.S. Department of State (FY 2021), https://travel.state.gov/content/dam/visas/ Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY21NIVDetailTable.pdf

[4] *Coerced under NAFTA: Abuses of Migrant Workers in the TN visa Program and Recommendations for Reform*, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under- NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf

[5] *See, e.g., Martinez-Rodriguez v. Giles*, 31 F.4th 1139 (9th Cir. 2022); *Peregrina v. SL Alabama, LLC, et al.*, No. 3:23-CV-00206-TCB-RGV (N.D. Ga. 2023); *Martinez, et al. v. de la Mobis Alabama, LLC, et al.*, 3:22-CV-00145-TCB-RGV (N.D. Ga. 2023); *Fuente v. Columbia Recycling Corp.*, --- F. Supp. 3d ----, 2023 WL 8713545 (N.D. Ga. 2023).

48.     Sewon has sent representatives to Mexico, including Nathan Jung, to recruit Mexican engineers to work for Sewon under the TN visa program.

49.     Sewon has also hired Mexican engineers under the TN visa program through Defendant TESS.

50.     TESS is a labor recruiter based in Braselton, Georgia and with offices in Mexico.

51.     Beginning at least as early as October 2019 and continuing through at least March 2022, TESS advertised professional job opportunities in the automotive industry at multiple universities and other places in Mexico.

52.     Sewon has used TESS to recruit Mexican engineers to work under the TN visa program at Sewon's LaGrange facility.

53.     TESS served as the first point of contact for Plaintiff Ruiz beginning in January 2021.

54.     TESS has also served as the recruiter and initial point of contact for other similarly situated Mexican engineers who were brought to work for Sewon under the TN visa program.

55.     And TESS has served as the recruiter for other TN visa workers it recruited to work for other companies in the Hyundai and Kia automotive manufacturing supply chain in LaGrange, Georgia, as alleged in *Martinez, et al. v. Mobis Alabama, LLC et al.*, No. 3:22-CV-00145-TCB-RGV (N.D. Ga. 2023) (Doc. 74, ¶¶ 114-24, 555-605).

10

56. According to TESS's website as late as December 2022, it was "the most efficient recruiting and staffing company in the market[,]" and claimed to "provide TN-Visa workers and help companies scale for growth" and "have over 10 years of experience providing recruiting and staffing services." (*Id.* at ¶ 117.)

57. On Facebook, TESS claimed in a Spanish-language post that it was "one of the recruitment agencies with the most contracts and job offers in the United States for Mexican professionals" and highlighted its "permanent recruitment" for jobs in the automotive industry." (*Id.* at ¶ 119.)

58. TESS assists Mexican nationals, such as Plaintiff Ruiz, in preparing and submitting applications to the U.S. Consulate for TN visas in order to gain authorization for those individuals to come to the U.S. and work for Sewon.

59. TESS brought Plaintiff Ruiz and similarly situated Mexican nationals to the U.S. to work at the Sewon facility in LaGrange through their coordinated effort described above.

### *Plaintiff Ruiz*

60. Plaintiff Ruiz was born and raised in Mexico, is a citizen of Mexico, and is not a citizen of the United States.

61. Mr. Ruiz is a skilled automotive technician and engineer.

62. In Mexico, Mr. Ruiz attended the Instituto Politéchnico Nacional, receiving degrees in industrial engineering and total quality control.

63.     Mr. Ruiz also received a Master of Business Administration from the Universidad del Valle de México.

64.     From 2001 through 2020, Mr. Ruiz worked for various automotive manufacturers in Mexico and occasionally traveled to the U.S. to perform work in automotive manufacturing facilities in Alabama and Tennessee.

65.     In January of 2021, Mr. Ruiz saw a job posted by Defendant TESS on the OCCMundial website (www.occ.com.mx) for a Mechanical Engineer working for an automotive assembly plant in the southeastern U.S.

66.     On or about February 8, 2021, Mr. Ruiz applied for the position, which included submitting his resume and answering employment background questions.

67.     Mr. Ruiz applied for this position in hopes of bringing his family to the United States so that his children could learn English, while he would have the opportunity to continue his profession in a more economically stable community, and utilize the technical skills and abilities he had developed over a nearly 20-year career.

68.     On February 12, 2021, TESS sent Mr. Ruiz an email through its representative, Alejandro Meneses, confirming receipt of Mr. Ruiz's resume for the position of a Mechanical Engineer in the southeastern U.S. (Ex. 1.)

69.     The email congratulated Mr. Ruiz on continuing with the application process and instructed Mr. Ruiz to submit several other documents including a

health and safety questionnaire, a copy of his Curriculum Vita in English, a picture of his passport and proof of his professional credentials. *Id.*

70.    On February 15, 2021 at 1:12 p.m., Mr. Ruiz submitted the requested documentation for evaluation by the TESS representative. In his email response, Mr. Ruiz explained to the recruiter that he would only be interested in jobs earning $60,000.00 USD, an amount he calculated based on previous short-term contract experience working for auto manufacturers in Alabama and Tennessee.

71.    On April 6, 2021, Mr. Ruiz received an email from jobs@tessllc.net which stated that in order to continue with the process he must:

    a.    Send his curriculum vita written in English;

    b.    Send documentation as a PDF showing his professional titles, professional credentials, a copy of his unexpired passport, proof of any active Visas, and a copy of his drovers license; and

    c.    Submit a completed version of a "health and safety" questionnaire which was attached to the original email. (Ex. 2.)

72.    On June 15, 2021, Mr. Ruiz received an email from TESS representative Manuel Garnica which included a letter from Sewon offering Mr. Ruiz a job as a "Technical Engineer" at 1000 Sewon Blvd. LaGrange, Georgia 30241. (Ex. 3.)

73.    The offer letter was dated June 14, 2021 and further indicated, among other things, that:

a. His "base salary would be $10.70 (Hourly) for 3 month waiting period. This amount is meant to compensate for all hours worked."

b. "After 3 month probation, your hourly rate will be increased $0.50. and also the hourly rate will be increased $0.50 every 6 month until top maximum rate $16.80."

c. And that "(a)fter 1 year from the completion of the 3-month probation, you will get the skill test from the Department and your hourly rate will be adjusted base on the test result." *Id.*

74. This offer letter was signed on behalf of Sewon by Sewon's Secretary and CFO Junho "Nathan" Jung. *Id.*

75. Mr. Ruiz signed the offer letter on June 16, 2021 and returned the executed document to TESS representative Manuel Garnica.

76. After Mr. Ruiz executed the agreement, TESS coordinated Mr. Ruiz's employment with Sewon by providing information and support relating to his TN visa application to the U.S. Consulate in Mexico.

77. For example, on June 19, 2021, TESS Specialist Jesus Monroy sent Plaintiff Ruiz an email explaining the process and letting him know that he would need to participate in three mock TN visa interviews with TESS representatives and advising him to revise his resume to include material to support his visa application.

14

78. In an effort to get Mr. Ruiz a TN visa so he could come to work for Sewon in their LaGrange, Georgia facility, TESS provided Plaintiff Ruiz with a TN visa Support Letter required by 8 C.F.R. 214.6(D)(3) which was dated June 21, 2021 and addressed to the U.S. Embassy in Mexico City. (Ex. 4.)

79. The Support Letter was on Sewon letterhead and signed by Sewon CFO Nathan Jung. *Id.*

80. The Support Letter represented that Sewon "wishe[d] to temporarily employ Mr. Jimmy Ruiz Heredia in the NAFTA occupation of Professional Engineer (as listed in NAFTA Chapter 16, Annex 1603)." *Id.*

81. The Support Letter also stated that "(t)he duties of the job position offered and the nature of the Sewon services require that a candidate possess a bachelor's degree in industrial engineering or related engineering fields and additional work experience in manufacturing fields. Sewon typically requires this education, 2/3 experience or its equivalent as a minimum requirement for entry into this occupation." *Id.*

82. The Support Letter further explained that Mr. Ruiz was "well-qualified" for the Industrial Engineer position because "he obtained a bachelor's degree in Industrial Engineering from the Instituto Politechnico Nacional in Mexico. In addition, he has over 21 years of experience in related fields," and claimed that "(t)he employment offered to Mr. Jimmy Ruiz Heredia in is at a specialized level." *Id.*

15

83.     The Support Letter represented that Mr. Ruiz's "main duties" would

be to:

- "Provide engineering expertise in developing a range of engineering solutions to improve the manufacture of new and existing Sewon's products";

- "Analyze and determine best equipment setup and process flow for maximizing fabrication of parts within a high-volume manufacturing environment";

- "Apply automated solutions to the transfer of materials, components, or finished goods";

- "Improve current production processes to manufacture products, using applicable methods and procedures";

- "Apply mathematical analysis to determine validity and reliability of sampling and work statistics";

- "Plan and schedule Manufacturing Orders to be completed in a timely manner by analyzing production capacities and scheduling all orders in the injection machines in a way that minimizes labor while decreasing the lead time to customers";

- "Monitor, analyze, and prepare weekly production reports and reports them to the Operations Managers with suggested ideas to improve production efficiencies; and"

- "Support Production engineers and management staff by assisting in daily challenges that occur and also by managing inventory and completing projects as required to help control operating expenses."

(Ex. 4, at pp. 3-4.)

84.    Sewon also indicated in the Support Letter that Mr Ruiz "will hold the internal job title of Industrial Engineer as a full-time employee and receive an annual salary of $36,000.00 plus a standard employee benefits package." *Id.*

85.    Also on June 21, 2021, Mr. Ruiz received a second offer letter from Sewon, also signed by Nathan Jung, confirming his title as "Industrial Engineer." (Ex. 5.)

86.    The second offer letter contained a provision that stated that Mr. Ruiz would be paid an "annual salary" of "$36,000.00 (Full time)" and did not include any language indicating that Mr. Ruiz's position would be hourly or that it would be less than $36,000 per year at any point in time.

87.    Sewon sent this second offer letter to Mr. Ruiz so that he would provide the letter to U.S. Immigration officials for the purpose of securing a TN visa.

88.    Although unknown to Mr. Ruiz, the required job qualifications and the position description provided in the job offer(s) and support letter to secure the TN visa were false.

89.    Sewon knew at the time Mr. Jung signed these documents that the job offers were inconsistent and the terms and conditions of the offers were fraudulent.

90.    Also unknown to Mr. Ruiz, he was the victim of a scheme to secure his employment for manual labor production line work at Sewon.

17

91.     On July 14, 2021, Mr. Ruiz received an email with attachments from TESS representative, Jesus Monroy. (Ex. 6.)

92.     The email from Mr. Monroy included information detailing the date and time of Mr. Ruiz's consular visit and instructions on how to prepare for it. *Id.*

93.     The attachments to Mr. Monroy's email included documents prepared by an attorney to present during the consular visit,[6] a spreadsheet where applicants were asked to report the questions and answers from the consular visit, and a "guide" on how to answer the questions during the consular visit. *Id.*

94.     The guide to the consular visit provided by TESS included instructions on how to answer specific questions in order to maximize the possibility of approval for a TN visa. *Id,* pp. 5-11.

95.     The guide cautioned Plaintiff Ruiz to "please be ready to anwer questions about the support letter." *Id.*

96.     The guide also list "possible questions and suggested answers" including some of the following:

    a.  What does the company do? A[nswer]: IT IS AN AUTOMOTIVE
        COMPANY… (add WHAT YOU HAVE LEARNED THAT COMES
        IN THE SUPPORT LETTER, IN YOUR OWN WORDS).

---

[6] The documents included Sewon's job offer letter stating Mr. Ruiz would earn $36,000.00 in salary, the Support Letter signed by Nathan Jung, a company profile for Sewon, and confirmation of the consular visit page.

b.  What are your work activities to be carried out? A[nswer]: (Here you answer those that come in your support letter in the part that says: 'His main job duties include the following')

c.  Describe how your studies and career are compatible for the employer in the United States. A[nswer]: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DEDICATE HERE IN MEXICO…[…]

d.  Why is the applicant qualified? A[nswer]: BECAUSE I HAVE AN ACADEMIC DEGREE (TECHNICAL OR ENGINEERING) […]

e.  What do you do here in Mexico? What are you activities in your current job? IN THIS RESPONSE YOU MUST MAKE IT CLEAR TO THE CONSUL THAT WHAT YOU DO IN YOUR CURRENT JOB IS RELATED TO WHAT YOU ARE GOING TO DO AT THE COMPANY THAT IS HIRING YOU.  *Id.*

97.  TESS and Sewon helped coach Plaintiff Ruiz and other similarly situated Mexican engineers on how to represent their backgrounds, qualifications and intentions to the U.S. Government to successfully obtain the TN visa.

98.  On or around July 27, 2021, Mr. Ruiz traveled to the U.S. Consulate in Mexico City for an interview to obtain a TN visa.

99.  Mr. Ruiz incurred travel and food costs which were never reimbursed.

19

100.    Mr. Ruiz paid $160 USD to submit his TN application, the cost of which was never reimbursed.

101.    The scheme by Defendants to fraudulently secure a TN visa for Mr. Ruiz was successful and, in reliance on the misrepresentations in the support letter and offer letter, the U.S. government granted a TN visa for Mr. Ruiz to work on a temporary basis in the U.S. at Sewon in LaGrange, Georgia.

102.    In reliance on the promises made by TESS and Sewon concerning the job promised to him in the support letter and his eligibility for that job under U.S. law, Mr. Ruiz moved from Mexico to the U.S. to begin work at the Sewon manufacturing plant in LaGrange, Georgia.

103.    On or around August 15, 2021, Mr. Ruiz started working for Sewon in LaGrange, Georgia.

104.    When Mr. Ruiz began the job, he had already expended significant costs and expenses to travel to the U.S., and he had foregone other employment opportunities.

105.    Mr. Ruiz immediately learned that the job he had been promised did not exist (or at least did not exist for him).

106.    Rather than perform technical services as promised by TESS and Sewon and as required for a TN visa, Mr. Ruiz was required to work as a "picker" on an assembly line, which meant receiving and installing between 300 and 400 of the same automotive parts and components daily, superficially verifying the

integrity of each component and then allowing the component to proceed to the next stage of manufacturing.

107.   Mr. Ruiz and other TN Visa holders were required to begin each shift by cleaning their work stations to clear away any refuse left behind by the workers on the previous shift. Afterwards, parts and components were delivered directly to the "pickers" work stations where they would manually install small pieces using welding tools to automobile chassis that were moving on the assembly line.

108.   The "picking" work required no technical skill and involved the repetitive selection of automotive parts on countless automobiles during each shift.

109.   Mr. Ruiz worked alongside American employees of Sewon and was supervised and received instruction on how to perform his job from Sewon supervisors, including managers.

110.   During the beginning probationary period of Mr. Ruiz's employment, he was paid $10.70 per hour.

111.   Mr. Ruiz received a raise in pay of $0.50 per hour following a three month probationary period.

112.   Thereafter, he received raises of $0.50 in pay every six months.

113.   Sewon also deducted $576.38 from Mr. Ruiz's pay for September 2021, even though during the recruitment process a man named Chin Alexander or

Alexander Chin told him that the first 15 days of housing would be provided by Sewon free of charge, and would cost between $350 and $425 per month thereafter.

114.    In a written contract on Sewon letterhead, Mr. Ruiz was also promised $2,000 of relocation expense reimbursement two years after joining Sewon, but he never received the reimbursement despite working for the company for the required time period.

115.    Sewon deducted money from Mr. Ruiz's payheck for the cost of rental car services even though he did not use such services.

116.    Sewon also deducted at least two weeks of housing from Mr. Ruiz's paycheck.

117.    American employees made more money when they started working for Sewon in the same position as Mr. Ruiz, including Monica Johnson, who started at $14.00 per hour in the summer of 2023, and Douglas Marquez.

118.    During his employment at Sewon, Mr. Ruiz was required to work overtime. Despite already working 12-hour shifts for six to seven days per week, many Mexican workers were required to extend their shifts by as much as 5 hours per day, resulting in 17-hour shifts.

119.    Defendant Sewon made it clear to Mr. Ruiz that the aforementioned hours and schedule were mandatory.

120.    Mr. Ruiz would receive written warnings and was assessed points if he left early, even if the early dismissal was pre-approved. Ten points could lead to termination.

121.    Following his first year of employment, Mr. Ruiz was moved to the "rework" area of the facility where he welded automotive materials for Sewon 12 hours a day in an unventilated area of the facility. This is a picture of the rework area:



122.    While working in the rework area, Mr. Ruiz performs manual labor on defective components per instructions from management. He also uses a forklift to move pallets containing autoparts for repair, and uses welding tools to perform manual labor. None of these duties required specialized knowledge or training.

123.    On countless occasions, Sewon's officers and managers, including Mr. Jung, Managing Director Jeon "Brian" In-Seok, and others directly observed Mr. Ruiz performing manual labor, both before he moved to the rework area and after, which did not qualify for the TN visa.

124.    Indeed, while working on the factory floor doing manual labor in the rework area, Mr. Ruiz encountered Managing Director Brian In-Seok approximately twice a week throughout the year and a half he worked at Sewon.

125.    During Mr. Ruiz's employment, the conditions under which he was required to perform the manual labor in the rework area were hazardous, including extreme heat and extreme cold.

126.    Mr. Ruiz complained directly to Mr. In-Seok about the hazardous conditions of his job, and complained to him specifically of discrimination.

127.    On August 5, 2023 Mr. Ruiz complained to a Sewon supervisor, Jason, that he was being treated differently than other workers when Michael Terry issued him a disciplinary action.

128.    Having received no response, on August 6, 2023, Mr. Ruiz complained  directly to Mr. In-Seok in writing that he was being discriminated against.

129.    Mr. Ruiz was fired on August 5, 2023, allegedly for insubordination after his complaints to management.

130.    During Mr. Ruiz's employment, Sewon also directed him to provide work that did not qualify for the TN visa for other entities, including Kia of America, Inc.

131.    For example, when a component was incorrectly installed on a Kia automobile, Sewon directed Mr. Ruiz to reinstall the component at the Kia facility located in LaGrange.

132.    At no time during his employment with Sewon did Mr. Ruiz ever "provide engineering expertise," "analyze and determine best equipment setup and process flow for maximizing production of parts," "develop standardized work instructions so operators can perform work safely," "apply mathematical analysis to determine validity and reliability of sampling and work statistics," or perform any other specialized engineering work as detailed in Sewon's Support Letter, which was all key in qualifying him for the TN visa program.

133.    Mr. Ruiz personally observed about 200 other Mexican engineers working under the TN visa program, that were required to perform manual labor, rather than work that would actually qualify them for the TN visa program.

134.    Plaintiff Ruiz and other similarly situated workers suffered pecuniary losses, including low wages and lost employment opportunities, as a consequence of Defendants' fraud.

*Plaintiff Serrano*

135.    Mr. Serrano was born and raised in Mexico, is a citizen of Mexico, and is not a citizen of the United States.

136.    He is a skilled technician and engineer.

137.    Mr. Serrano earned a Bachelor's degree in renewable energy engineering from the Universidad Tecnológica of Tulancingo in Mexico.

138.    Mr. Serrano became a victim to Sewon's scheme after meeting Sewon representatives at a job fair at the Universidad Tecnológica of Tulancingo in January 2021, where Sewon was offering employment in the U.S. for skilled technicians working in the automotive industry.

139.    Mr. Serrano applied for an engineering job after speaking with Sewon representatives at this event, including Sewon's Secretary, CFO, and General Manager Nathan Jung.

140.    Mr. Serrano applied for a position as a maintenance engineer working at the production facility located in LaGrange, Georgia in hopes of being able to come to the U.S. to expand his technical skills and earn a better living.

141.    On August 3, 2021, Mr. Serrano received an email sent by Sewon to himself and fifty-three other job applicants who would require TN visas explaining the process for applying for the TN visa and directing Mr. Serrano and the others to send over various documents to begin the process. (Ex. 7.)

142. Mr. Jung and Henry Shin (then the Facility Manager at the Sewon facility in LaGrange) were copied on the email. (*Id.*)

143. Mr. Serrano provided the documents to Sewon the next day.

144. This same email correspondence also included a "Relocation Repayment Agreement" written in English and on Sewon letterhead. The contract stated that applicants would be reimbursed $2,000 related to relocation expenses contingent on certain criteria. (Ex. 8.)

145. On April 8, 2021, Mr. Serrano signed the reloction contract. (Exhibit 14).

146. Mr. Serrano was eligible for the $2,000 reimbursement but he was never reimbursed for all of his relocation expenses and other costs and fees associated with his TN visa application and processing.

147. On August 9, 2021, the same representative from Sewon emailed Mr. Serrano regarding the next steps in the process, which stated:

a. "Access this link https://ais.usvisa-info.com/en-mx/niv , you will register and there you will put your confirmation number of the form DS160 (remember it is for TN visa), once you put your data, it will ask you to make the payment in the bank of your choice, (questions at the counter if they can help you make a payment to the embassy with the data that you give the official page)"

27

b.   "Once this is done, please send us the mail and the password to be able to assign you the dates of interview, when the lawyer has your complete file, he will schedule the appointment on your data and will give you instructions for the interview at the embassy."   (Ex. 9).

148.   On August 10, 2021, Mr. Serrano emailed the Sewon representative to report that he had paid for his visa application, and provide them with the username and password for his visa login so that an attorney working on behalf of Sewon could handle the processes for applying for the TN visa with the U.S. Consulate on behalf of Mr. Serrano.

149.   Mr. Serrano communicated with these individuals, who repeatedly told Mr. Serrano that he would be hired for an engineer position where he would help improve system processes and maintain specialized machinery at the Sewon facility.

150.   Mr. Serrano was never told that the job for which he applied was a manual labor position on a production line.

151.   Sewon's Secretary, CFO, and General Manager Mr. Jung sent Mr. Serrano a letter on August 19, 2021 offering him employment as a Maintenance Engineer at Sewon located at 1000 Sewon Drive, LaGrange, Georgia. (Ex. 10.)

152.    The offer letter stated, among other things, that Mr. Serrano would be paid an "annual wage" of $36,000.00 and did not indicate that his position was hourly or that he would be paid any less at any point in time. *Id.*

153.    The offer letter was signed by Nathan Jung. *Id.*

154.    In an effort to get Mr. Serrano a TN visa so he could come to work in the United States, Sewon prepared a Support Letter to the U.S. Consulate pursuant to 8 C.F.R. 214.6(d)(3), which was presented to the consulate as part of a required submission for Mr. Serrano's TN visa application. (Ex. 11.)

155.    Sewon provided the support letter to Mr. Serrano for inclusion in his TN visa application along with instructions on how to answer certain questions the consul may ask.

156.    The Support Letter was on Sewon America, Inc. letterhead, dated August 20, 2021, addressed to the U.S. Embassy in Mexico City, Mexico, and signed by Nathan Jung. *Id.*

157.    The Support Letter explained that Mr. Serrano was being offered a Maintenance Engineer position which "falls within the schedule of the permitted TN occupations – Engineer- authorized by NAFTA." *Id.*, p. 2.

158.    The Support Letter further outlined the "main job duties" of the maintenance engineer, to include the following:

- "Serve as an engineering subject matter expert on optimization, performance, preventative maintenance, and availability of the production equipment;"

- "Identify and initiate continuous improvement activities to ensure quality, volume and availability targets are met;"

- "Lead equipment failure investigations, determine root cause and implement corrective and preventative actions;"

- "Develop equipment performance requirements for the facility and implement management system to ensure achievement by coordinating repairs and refurbishments within approved budgetary guidelines;"

- "Analyze equipment performance and replacement and make recommendations for improvement in the overall maintenance areas based on failure data, craft feedback, and design modifications;"

- "Continuously evaluate workplace for safety concerns and ensures behavioral safety initiatives are performed to goal levels;"

- "Plan and execute preventive maintenance schedules of various equipment to increase machine up time and equipment reliability; and"

- "Prepare reports to notify operations and maintenance of equipment health and recommend remaining time to mandatory shutdown or failure of equipment."

(*Id.*, pp. 2-3.)

159. The Support Letter also explained that Mr. Serrano was "well-qualified" to perform the Maintenance Engineer job because of his bachelor's degree in engineering and his three years of engineering experience. *Id.* at p. 4.

160. The Support Letter further explained that the Maintenance Engineer role being offered to Mr. Serrano "requires the services of an individual whose academic background in Engineering and professional experiences will enable them to plan and optimize equipment and control systems to identify and implement improvement activities that result in MRO cost reduction and increased equipment uptime in a high speed/high volume manufacturing facility of Sewon." *Id.*

161. The Support Letter also included extensive information about Sewon, and attached documents including the company profile of Sewon America, Inc. and Sewon's operations. *Id.*

162. The materials Sewon attached to the Support Letter submitted on behalf of Mr. Serrano's TN visa application contained detailed information about specialized equipment being used in the assembly department of the Sewon facility, such as 3D Scanners, Ultrasonic Testers, and Welding Robots:



163.   Despite his qualifications and experience and Sewon's representations to him and the U.S. Government, Mr. Serrano never once used or serviced a welding robot or any other kind of industrial engineering equipment during his employment at Sewon.

164.   On August 21, 2021, a representative of Sewon emailed Mr. Serrano an instructional interview guide detailing how to answer certain questions the U.S. Government might ask, including possible questions and suggested answers. (Exhibit 15).

165.   Henry Shin (psalm80@hotmail.com) was copied on this email. He was the Facility Manager at Sewon at the time this email was sent. *See* https://www.linkedin.com/in/hwanjong/ (last visited March 14, 2024).

166.   The interview guide provided to Mr. Serrano is nearly identical to the one TESS provided Mr. Ruiz. (*Cf.* Ex. 6).

167.   The interview guide included instructions on how to answer specific questions in order to maximize the possibility of approval for a TN visa. (Ex.15).

168.   The guide cautioned Plaintiff Ruiz to "please be ready to anwer questions about the support letter." *Id*.

169.   The guide also list "possible questions and suggested answers" including some of the following:

   a. What does the company do? A[nswer]: IT IS AN AUTOMOTIVE
      COMPANY… (add WHAT YOU HAVE LEARNED THAT COMES

IN THE SUPPORT LETTER, IN YOUR OWN WORDS. INVESTIGATE ON THE SEWON PAGE WHAT EXACTLY THEY PRODUCE ETC.

b. What are your work activities to be carried out? A[nswer]: (Here you answer those that come in your support letter in the part that says: 'His main job duties include the following')

c. Describe how your studies and career are compatible for the employer in the United States. A[nswer]: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DEDICATE HERE IN MEXICO…[…]

d. Why is the applicant qualified? A[nswer]: BECAUSE I HAVE EXPERIENCE IN THAT […]

e. What do you do here in Mexico? What are you activities in your current job? IN THIS RESPONSE YOU MUST MAKE IT CLEAR TO THE CONSUL THAT WHAT YOU DO IN YOUR CURRENT JOB IS THE SAME THING YOU ARE GOING TO DO AT THE COMPANY THAT IS HIRING YOU or that you have the ability to do the new job because you have studies in that area. *Id.*

170.   The guide also gave him example questions in English, which indicated he should answer that the company he would be working for (Sewon) is

located on 1000 Sewon Boulevard in LaGrange, Georgia and they manufacture body parts for the frames of Kia and Hyundai cars. *Id.*

171.   Over the following days, other representatives of Sewon coached Mr. Serrano in meetings and messages over Skype and Whatsapp on how he should represent his background, qualifications and intentions to the U.S. Government to obtain the TN visa. They advised him to focus on his engineering background and employment experience.

172.   On or around August 24, 2021, Mr. Serrano traveled to the U.S. Consulate in Mexico City for an interview to obtain a TN visa.

173.   Mr. Serrano incurred travel and food costs which were never reimbursed.

174.   Mr. Serrano paid the full amount required for the application for the TN visa, the cost of which was never reimbursed.

175.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Serrano was successful and, in reliance on the misrepresentations in the Support Letter and offer letter, the U.S. government granted a TN visa for Mr. Serrano to work on a temporary basis in the U.S. at Sewon in LaGrange, Georgia on September 1, 2021.

176.   In reliance on the promises made by Sewon concerning the job promised to him in the support letter and his eligibility for that job under U.S. law,

Mr. Serrano moved from Mexico to the United States on September 27, 2021, to begin work at the Sewon manufacturing plant in LaGrange, Georgia.

177.   On or around September 30, 2021, Mr. Serrano started working for Sewon in LaGrange, Georgia.

178.   When Mr. Serrano began the job, he had already expended significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

179.   Mr. Serrano immediately learned that the job he had been promised did not exist (or at least did not exist for him).

180.   Rather than perform technical services as promised by Sewon and as required for a TN visa, Mr. Serrano was required to work as a "picker" on an assembly line, which meant receiving and installing between 300 and 400 of the same automotive parts and components daily and superficially verifying the integrity of each component and then allowing the component and vehicle chassis to proceed to the next stage of manufacturing.

181.   The "picking" work required no technical skill and involved the repetitive selection of automotive parts on countless automobiles during each shift.

182.   During the beginning of Mr. Serrano's employment, he was paid $10.70 per hour.

183.   Mr. Serrano received a raise in pay of $0.50 following a three month probationary period.

184.   Thereafter, he was promised that he would receive a raise in pay of $0.50 every six months, but these raises were given sporadically and not in accordance with what was originally promised.

185.   Mr. Serrano works alongside American employees of Sewon and is supervised and receives instruction on how to perform his job from Sewon supervisors, including managers.

186.   Mr. Serrano is required to work overtime. He works 12-hour shifts and alternates between working five-day workweeks and six-day workweeks, often times working well into the night depending on the production schedule.

187.   Sewon has made it clear to Mr. Serrano that the aforementioned hours and schedule were mandatory.

188.   All TN visa workers at Sewon are required to work as "pickers" on the assembly line for their first year of employment.

189.   After a full year of manual labor work on the production line, Mr. Serrano was moved to the "rework" area, where he performs manual labor on defective components per instructions from management. He also uses a forklift to move pallets containing autoparts for repair, and uses welding tools to perform manual labor. None of these duties required specialized knowledge or training.

190.   Furthermore, Mr. Serrano is subjected to dangerous temperatures, unsafe working conditions, and hazardous materials while employed by Sewon.

191.   At no time during his employment with Sewon has Mr. Serrano ever "[s]erve[d] as an engineering subject matter expert on optimization, performance, preventive maintenance, and availability of the production equipment," "analyze[d] equipment performance and replacement and make recommendations for improvement in the overall maintenance areas based on failure data, craft feedback, and design modifications[,]" "[d]evelop[ed] equipment performance requirements for the facility and implement management system to ensure achievement by coordinating repairs and refurbishments within approved budgetary guidelines[,]" or performed any other specialized engineering work as detailed in Sewon's Support Letter, which was all key in qualifying him for the TN visa program.

192.   During his employment with Sewon, Mr. Serrano has observed over 100 other TN visa workers performing manual labor that was not specialized engineering work which would qualify for the TN visa.

## RICO VIOLATIONS

### *RICO Enterprise*

193.   Sewon and TESS were an enterprise (hereinafter referred to as the "RICO Enterprise") within the meaning of the Georgia RICO in that they were associated in fact although not a legal entity.

37

194.    This RICO Enterprise is an ongoing organization with a framework, either formal or informal, for carrying out its common purpose.

195.    At all relevant times, the RICO Enterprise existed for the common purpose of securing cheap manual labor to work at the Sewon plant and to profit from such labor.

196.    The association comprising the RICO Enterprise began as early as January 2021 and was used to defraud Plaintiffs, the U.S. government, and many other foreign workers recruited from Mexico to work for Sewon.

### *Association-in-Fact*

197.    Sewon and TESS associated with each other for the common purpose of recruiting Mexican engineers and technicians for and employing Mexican engineers and technicians on Sewon's production line.

198.    Sewon and TESS agreed to recruit and employ foreign workers to work as laborers on Sewon's production line in LaGrange, Georgia.

199.    TESS agreed with Sewon to publish fraudulent job postings for open engineer positions or other positions with education and skill requirements necessary to make foreign workers qualified for TN visas employment at the Sewon plant.

200.    In furtherance of the scheme, Sewon provided TESS detailed information relating operations at the Sewon plant to use during recruitment and to include in the TN visa Support Letters, including information about the work

Sewon needed industrial, maintenance, and technical engineers to perform at its facility.

201.   Sewon and TESS agreed to this scheme as evidenced by Sewon hiring Plaintiffs once they secured a TN visa and employing them in its LaGrange plant.

202.   The RICO Enterprise, and each Defendant individually, engaged in racketeering activities including but not limited to false statements and writings in violation of O.C.G.A. § 16-20-10; mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; labor contracting fraud in violation of 18 U.S.C. § 1351; and misuse of visas in violation of 18 U.S.C. § 1546, all of which constitute racketeering activity under O.C.G.A. § 16-14-3(5)(A)-(B).

203.   Defendants' fraudulent acts and scheme described above damaged Plaintiffs and similarly situated employees.

204.   Defendants' agreement to this scheme is evidenced by their knowledge of the TN visa requirements, knowledge that foreign engineering workers must have a TN visa and work authorization, and their review of TN visa documents with full knowledge that the foreign workers were not performing jobs that qualified them to receive the TN visa.

205.   Defendants agreed to make false representations to Plaintiffs, among many other similarly situated Mexican workers, that the jobs available at the Sewon plant required the education and skill that would make them eligible for TN visas and entice them to apply, while knowing that these jobs did not exist and

that Plaintiffs and others would be working manual labor production assembly line jobs.

206.   Sewon sent personal representatives to Mexico, including Nathan Jung, to entice Mexican engineers to apply for work with Sewon in the U.S.

207.   TESS, acting as a recruiter for Sewon, made these misrepresentations and committed overt acts of collecting information, causing the mail/wires to be used to transmit and in furtherance of the false and fraudulent statements to Plaintiffs, the U.S. government, and others, facilitating consular interviews for the Plaintiffs, preparing Plaintiffs for their consular interviews (including preparation of the types of questions they would be asked, and the answers to give), and providing other information to Sewon.

208.   Acting on the basis of fraudulent misrepresentations made by Sewon and TESS, and with the plan and intention of using the same to defraud the U.S. Government in connection with TN visa applications, Plaintiffs and others were offered jobs at Sewon as outlined by Defendants in the Support Letters.

209.   Yet, Defendants knew that TN visas would not and could not be granted for workers to perform the manual labor positions that Sewon wanted to fill.

210.   Knowing that TN visas would be granted only for professional foreign workers for professional-level job positions, Defendants agreed that they (1) would recruit high skilled Mexican and Hispanic engineers and technicians for

Sewon who satisfied the TN visa requirements; and (2) would misrepresent the production line labor positions (which did not qualify for TN visas) as professional-level engineering and technician job positions (which did qualify for TN visas).

211.   The plan continued with Defendants vetting the Plaintiffs and other candidates, obtaining their resumes, technical or bachelor's degrees, and checking their educational background and engineering and/or technician skills before offering jobs to each of them.

212.   The plan continued with TESS, during the interviews, confirming that Plaintiff Ruiz and other foreign workers were in fact highly skilled and highly educated, and concealing the nature of the job available for the Plaintiffs and other foreign workers.

213.   The plan continued with TESS providing fraudulent job offers to Plaintiff Ruiz and other foreign workers on behalf of Sewon.

214.   The plan continued with Sewon preparing, and TESS providing, fraudulent TN visa Support Letters to Plaintiffs and other foreign workers that mispresented the job positions, duties, and pay so that the job positions met the requirements for TN visas and so that Plaintiffs and other foreign workers would accept the job positions and apply for TN visas, to their detriment.

215.   The plan continued with TESS and Sewon providing Plaintiffs and other workers directions on how to prepare for and answer questions during their consular interviews so that they could obtain TN visas.

216.   At the time that Sewon and TESS provided the fraudulent TN visa Support Letters to the Plaintiffs and other foreign workers, offering them an engineer or technician position, Defendants knew that the letters included false descriptions of the job positions available for the Plaintiffs and other workers, false descriptions of the pay to the Plaintiffs and other foreign workers, and other false information.

217.   The fraudulent TN visa Support Letters were directed to the U.S. and were part of these Defendants' scheme, through the RICO Enterprise described above to commit the fraud.

### Participation in the Operation and Management of the Enterprise's Affairs

218.   Sewon directed TESS to post job announcements for positions of employment at the Sewon plant which would, by reason of the education, experience, and skill required, qualify the successful applicant to obtain a TN visa.

219.   Sewon and TESS developed a strategy to recruit foreign workers who may be qualified for the TN visa, including by identifying appropriate websites and other locations in which to post announcements for jobs at the Sewon facility.

220.   Sewon representatives, including Nathan Jung, went to Mexico to

recruit Mexican nationals, including Plaintiff Serrano, with false and fraudulent misrepresentations about the jobs available at Sewon.

221.    TESS executed the strategy by communicating with Plaintiff Ruiz and at least 53 other potential targets of the fraudulent scheme to screen them for employment with Sewon, checking their educational background and engineering or technician qualifications, and preparing them for their consular interviews.

222.    TESS accepted the directives of Sewon and provided information concerning the positions at Sewon to individuals who responded to the announcements they posted.

223.    TESS made false statements and fraudulent misrepresentations to the candidates during their job interviews.

224.    TESS and Sewon decided which candidates to hire, and then Sewon directed TESS to provide those candidates with job offers for jobs that did not exist.

225.    TESS and Sewon prepared Support Letters for hired candidates, with the approval of Sewon, whose General Manager and CFO signed them, and provided them to the candidates.

226.    TESS provided the Support Letter to Plaintiff Ruiz and other similarly situated workers.

227.    Sewon provided the Support Letter directly to Plaintiff Serrano and other similarly situated workers.

228.    TESS and Sewon both provided the fraudulent Support Letters to the

U.S. Consulate for Plaintiffs and others similarly situated.

*Pattern of Continuous Coordinated Conduct*

229.   In January 2021, TESS posted a job with Sewon on the OCCMundial website, which was seen and responded to by Mr. Ruiz in the following months.

230.   On March 3, 2021, Sewon sent an email to 53 applicants for employment who required a TN visa, including Plaintiff Serrrano. (Ex. 7.)

231.   Sewon has recruited hundreds of TN visa workers to work at its facility in LaGrange, Georgia, with the highest number of TN visa workers employed there at one time between January 2021 and August 2023 totaling 190.

232.   TESS has recruited hundreds of others to work in fraudulent TN visa jobs at other companies, as alleged in other cases pending before this Court. *See, e.g., Martinez, et al. v. Mobis Alabama, LLC et al.*, No. 3:22-CV-00145-TCB-RGV (N.D. Ga. 2023) (Doc. 74, ¶¶ 114-24, 555-605); *Herrera et al. v. SMART Alabama, LLC and Total Employee Solution Support*, No. 1:23-CV-01519-SCJ (N.D. Ga. 2023) (Doc. 1, ¶¶ 25-28, 39-53, 65-78).

233.   For example, on November 15, 2022, TESS posted a job fair announcement on Facebook claiming that it was hiring "Mexican professionals" for work with a "TN visa" and had vacancies for "engineers and technicians."

234.   Sewon has continued this illegal scheme by continuing to employ workers under the TN visa program who are highly skilled but employed in

manual labor, low-skilled positions and at lower pay than the American worker from as early as January 2021 through the present, and continues to profit from it.

235.    Defendants recruited hundreds of foreign workers under the TN visa program under this scheme to advertise false job openings, make job offers with false job titles, submit false TN visa Support letters, induce the foreign workers to come to the U.S. for non-existent jobs, and require the foreign workers to work in manual labor positions for lower pay, discriminatory pay, and pay that violated the FLSA.

236.    A TN visa is tied to the associated employer for the duration of the TN visa period, unless a different employer submits a Petition for Nonimmigrant Worker (USCIS Form I-129) to USCIS seeking to add or change employers. 8 C.F.R. § 214.6(i)(1). Thus, Defendants necessarily must continue the fraud against the U.S. Government when they seek to renew their employees' TN visas at the end of the one or three-year visa period.

237.    Upon information and belief, Defendants continue to recruit Mexican nationals to work with TN visas at Sewon for jobs that they believe non-TN visa holders will not perform.

### Racketeering Activity through Numerous Predicate Acts of Fraud

238.    As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires the job announcements used to recruit candidates like Plaintiffs and others for employment with Sewon.

239.   The job announcements contained material misrepresentations upon which Plaintiffs and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343 and O.C.G.A. § 16-10-20.

240.   As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires the offer letters which offered non-existent jobs at or with Sewon to Plaintiffs and others.

241.   The job titles in the offer letters were material misrepresentations upon which Plaintiffs and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343 and O.C.G.A. § 16-10-20.

242.   As part of a scheme or artifice to defraud, Defendants caused to be transmitted to Plaintiffs and others by mail and/or wires support letters addressed to to the U.S. Government regarding the jobs to be performed by Plaintiffs and others.

243.   Defendants made material misrepresentations in the statements of fact submitted to the U.S. Government, and the U.S. Government relied on those statements in issuing TN visas to Plaintiffs and others, constituting violations of 18 U.S.C. §1341 and/or §1343 and §1546.

244.   As part of a scheme or artifice to defraud, Defendants used materially false or fraudulent representations or promises regarding employment offered to Plaintiffs and others knowingly and with the intent to defraud in violation of 18 U.S.C. § 1351.

245.   As part of a scheme or artifice to defraud, Defendants used false attestations to secure work authorization for Plaintiffs and others and/or knowingly subscribed as true false statements concerning the jobs to be performed by Plaintiffs and others, as well as other false statements concerning the terms and conditions of Plaintiffs' and others' employment, as set forth in Plaintiffs' Statement of Facts above, which were material facts in an application, affidavit, or other document submitted for use in immigration proceedings to obtain a visa, constituting a violation of 18 U.S.C. § 1546.

246.   Defendants each knowingly and with the intent to defraud recruited, solicited, and hired Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

247.   Sewon agreed with TESS, knowingly and with the intent to defraud, that they would recruit, solicit, and hire Plaintiff Ruiz and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

248.   Defendants used false attestations and provided fraudulent TN visa Support Letters to the United States government for purposes of committing visa fraud in violation of 18 U.S.C. § 1546; *see e.g., U.S. v. Wu*, 20-10273, 2022 WL 4461376, at *3 (9th Cir. Sept. 26, 2022).

249.   Each Defendant conducted or participated in the RICO enterprise through a pattern of racketeering activity.

### *Plaintiffs' Pecuniary Injuries Directly and Proximately Caused by Defendants' Pattern of Racketeering Activity*

250.   Defendants knowingly and through fraudulent conduct induced Plaintiffs and other foreign workers to unknowingly pay for and apply for a fraudulent TN visa, to travel to the U.S. for a job that did not exist, and to accept employment at terms that were less than promised.

251.   Sewon did not pay Plaintiffs and other foreign workers the salary promised in the Support Letters provided to them and the U.S. government.

252.   Plaintiffs and other TN visa foreign workers suffered pecuniary losses that were directly and proximately caused by the fraudulent job posting for a position with Sewon, the application and related information provided to them, the offer letters provided to them, and the Support Letters provided to them and the U.S. Consulate by Defendants, and the resulting TN visas issued to them, including but not limited to:

      a.    Travel costs to and from the U.S. consulate for the mandated TN visa interview;

      b.    U.S. Government visa processing fees of $160 per visa;

      c.    Unreimbursed expenses for travel to the U.S. to work for Sewon and return travel to Mexico;

d.   Costs to purchase essential furniture and household goods upon arrival; and

e.   Lost wages in the form of the difference between the wages promised in the support letter and the lower wages actually paid.

253.   These pecuniary losses and others would not have been suffered but for the material misrepresentations Defendants made to Plaintiffs and others as part of the scheme to defraud them and the U.S. Government to recruit Plaintiffs and others for jobs that did not exist.

## The RICO Conspiracy

254.   Defendants conspired with each other to engage in a fraudulent scheme in violation of the Georgia RICO.

255.   Defendants agreed that TESS would post multiple fraudulent job announcements using wires; that TESS would send multiple fraudulent job offers for non-existent jobs to multiple different candidates; and that TESS would send fraudulent Support Letters to Plaintiff Ruiz and others and the U.S. Government, which constitute multiple predicate acts of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and/or § 1343, labor contracting fraud in violation of 18 U.S.C. § 1351, misuse of visas in violation of 18 U.S.C. § 1546, and false statements and writings in violation of O.C.G.A. § 16-10-20.

256.   Sewon (a) retained the services of TESS to engage in the scheme to

defraud Mexican engineers and the U.S. government for the same common purpose, and (b) Sewon and TESS both took affirmative steps, including coordinating communications with Mexican engineers and the U.S. government, knowingly and in furtherance of this fraudulent scheme.

257.   Sewon conspired with TESS, acting through the RICO Enterprise, by adopting the goal of furthering and participating in the objectives of the RICO Enterprise to engage in a fraudulent scheme.

258.   Sewon and TESS agreed that TESS would post multiple fraudulent job announcements using wires; that TESS would send multiple fraudulent job offers for non-existent jobs to multiple different candidates; and that TESS would send fraudulent Support Letters to Plaintiffs and others and the U.S. Government, which constitute multiple predicate acts of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and/or § 1343, labor contracting fraud in violation of 18 U.S.C. § 1351, misuse of visas in violation of 18 U.S.C. § 1546, and false statements and writings in violation of O.C.G.A. § 16-10-20.

259.   Each Defendant committed at least one overt act to effect the object of the conspiracy.

## CLASS ACTION ALLEGATIONS

260.   Plaintiffs bring their RICO and contract claims on behalf of themselves and a Class of persons ("the Recruitment Class") consisting of:

> All individuals who, between March 15, 2019 and the present,
> (1) were recruited by TESS or Sewon, (2) were employed at the
> Sewon plant in LaGrange, Georgia, (3) received wages from Sewon;
> and (4) were TN visa holders.

261.    Plaintiffs also bring Section 1981 claims on behalf of a Class of persons

("the Discrimination Subclass") consisting of:

> All individuals who, between March 15, 2019 and the present, (1)
> were recruited by Sewon or TESS, (2) were employed at the
> Sewon plant in LaGrange, Georgia, (3) received wages from
> Sewon; and (4) were non-white Hispanic or Latino, and are
> Mexican.

262.    Excluded from the Classes are the legal representatives, officers,

directors, assigns, and successors of Defendants; any individual who at any time

during the Class periods have had a controlling interest in any Defendant; and all

persons who submit timely and otherwise proper requests for exclusion from the

Classes.

### *Numerosity*

263.    There are over 190 individuals who are members of the Recruitment

Class and the Discrimination Class based on the number of TN visa employees

who worked at Sewon from 2021 through the present.

264.    The members of the Classes are sufficiently numerous that joinder of

all members is impractical.

### *Existence and Predominance of Common Questions*

265.    Common questions of law and fact exist as to Plaintiffs and members

of the Classes and predominate over questions affecting only individual Class members.

266.   These common questions include:

a.   whether Defendants conspired to violate the Georgia RICO;

b.   whether Defendants, through a RICO Enterprise, committed a pattern of racketeering activity causing Plaintiff and other TN visa holders to suffer pecuniary losses;

c.   The nature and extent of class-wide injury and the measure of damages for those injuries;

d.   Whether Sewon discriminated against the Discrimination Class by paying them less than, requiring them to work longer than, and/or subjecting them to harsher discipline than U.S. nationals, non-Mexican nationals, and non-Hispanic workers.

e.   Whether Sewon's actions were undertaken knowingly, willfully, intentionally, and without justification to deprive the Discrimination Class members of their rights, and/or whether Sewon acted intentionally and with malice or reckless indifference to the federally protected rights of the Discrimination Class members;

f.   Whether Sewon breached a contractual promise to Plaintiffs and others to provide employment with job duties requiring

engineering and/or technical education, experience, and skill at salaries presented in the support letters; and

g.    The nature and extent of class-wide injury and the measure of damages for those injuries.

### *Typicality*

267.   Members of the Classes have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

268.   Plaintiffs and Class members have the same rights under applicable laws.

269.   Plaintiffs and Class members were recruited and employed under the same or similar circumstances giving rise to the same claims.

270.   Plaintiff suffered similar types of pecuniary damages.

271.   Plaintiffs' claims are typical of the claims of the Recruitment Subclass because, among other things, they (a) were TN visa holders; (b) are non-white Hispanic or Latino, non-U.S. citizens, and Mexican; and (c) were employees who worked for Sewon and were recruited by Sewon or TESS suffered the same violations as the proposed Recruitment Subclass members.

272.   Plaintiffs' claims are typical of the claims of the Discrimination Subclass because, among other things, they (a) are non-white Hispanic or Latino, non-U.S. citizens, and Mexican; and (c) were employees who worked for Sewon,

and suffered the same violations as the proposed Discrimination Subclass members.

273.   Plaintiffs' interests are co-extensive with the interests of the Class and Subclass members; Plaintiffs have no interest adverse to the Class or Subclass members.

274.   Plaintiffs and the Class and Subclass members were offered and did accept the same terms and conditions of employment which Defendants are alleged to have breached.

## *Adequacy*

275.   Plaintiffs will fairly and adequately represent the interests of the Class and Subclass members. Their interests do not conflict with the interests of the members of the Class and Subclasses they seek to represent.

276.   Plaintiffs understand that, as Class representatives, they assume a responsibility to the Class and Subclasses to represent their interests fairly and adequately.

277.   Plaintiffs have retained counsel experienced in prosecuting class actions and in employment matters. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

## *Superiority*

278.   A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

279.   The damages suffered by each individual Class and Subclass member may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

280.   Further, it would be difficult for members of the Class and Subclasses to obtain individual redress effectively for the wrongs done to them. If individual actions were to be brought by each member of the Class and Subclasses, the result would be a multiplicity of actions, creating hardships for members of the Class and Subclasses, the Court, and Defendants.

281.   Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

282.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

283.   This case does not present individualized factual or legal issues which would render a class action difficult.

284.   In the alternative, the Classes may be certified because: (a)   the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class and members, which would establish incompatible standards of conduct for

Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## FLSA COLLECTIVE ACTION ALLEGATIONS

285.   Plaintiffs and other similarly situated TN visa workers regularly worked at Sewon in excess of 40 hours per week ("overtime") for the duration of their employment.

286.   As a condition of obtaining their employment with Sewon, Plaintiffs and other similarly situated TN visa holders were required to incur the cost of their TN visas and inbound and outbound travel expenses, which primarily benefitted Defendants, and were not reimbursed in Plaintiffs' first and/or final workweeks, effectively reducing Plaintiffs' wages below their required overtime rates of pay, in violation of the FLSA.

287.   Sewon similarly did not pay Plaintiffs and others similarly situated the correct overtime wages at a rate of one-and-half their regular rates of pay in view of limited reimbursement payments that were made, in violation of the FLSA.

288.   Sewon also improperly deducted from Plaintiffs' pay the costs of housing and transportation, thus depriving Plaintiffs of required minimum wages in violation of the FLSA.

289.   Sewon's actions and omissions alleged above were willful in that it was aware of its obligations regarding overtime wages, showed reckless disregard for whether its conduct violated the FLSA, or acted without a reasonable basis to believe its actions were in compliance with the FLSA.

290.   Plaintiffs and other TN visa holders were subject to the same policies and practices of Sewon.

291.   Common proof applicable to Plaintiffs and the other TN visa holders will show that Sewon failed to properly pay the required minimum and/or overtime wages.

292.   Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA opt-in class, but this information is readily ascertainable from Sewon's records.

293.   Sewon should be required to provide Plaintiffs with a list—including last known addresses, telephone numbers, and email addresses if known—of all individuals who were TN visa holders employed at the Sewon plant between February 21, 2021 and the date the Court grants conditional certification of this collective action.

294.   For purposes of the FLSA, Plaintiffs bring this suit on behalf of

themselves and the following all similarly situated workers who worked at the Sewon plant within within the three-year period before the filing of this Complaint, who elect to opt-in to this action under the FLSA, 29 U.S.C. § 216(b), and were:

    a.    paid a regular rate that did not include the fair value of housing and transportation assistance provided;

    b.    not reimbursed in full for inbound or outbound visa and travel costs or other deductions; or

    c.    otherwise deprived of minimum or overtime wages.

## COUNT I
**Georgia Racketeer Influenced And Corrupt Organizations Act,**
**Ga. Code. Ann. § 16-14-1** *et seq.*
**Class Claim**
*Against Defendants Sewon and TESS*

295.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

296.    This Count sets forth Plaintiffs' and Recruitment Class members' claims for damages against Defendants caused by their violations of Georgia RICO.

297.    Each Plaintiff is an aggrieved person with standing to sue within the meaning of Georgia RICO, O.C.G.A. § 16-14-6(b).

298.   Each Plaintiff is a person who was injured by reason of violations of O.C.G.A. § 16-14-4, and therefore, Plaintiffs have standing to sue pursuant to Georgia RICO, O.C.G.A. § 16-14-6(c).

299.   Defendants each individually, through a pattern of racketeering activity as described below, or proceeds derived therefrom, acquired or maintained an interest in money, in violation of O.C.G.A. § 16-14-4(a).

300.   Defendants are associated in fact although not a legal entity, and therefore are a RICO enterprise, as defined above, within the meaning of O.C.G.A. § 16-14-3(3).

301.   The RICO Enterprise defined above is an association-in-fact enterprise with the common purpose of securing cheap manual labor to work at Sewon plant in violation of the immigration laws, and to profit from such labor.

302.   The RICO Enterprise functions as a continuing unit.

303.   Defendants were each employed by or associated with the RICO Enterprise and conducted or participated in, directly or indirectly, the RICO Enterprise described above through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(b).

304.   Specifically, the predicate acts of racketeering activity by which the Defendants committed the Georgia RICO violations set forth in the preceding paragraphs, both individually in violation of § 16-14-4(a) and through the RICO Enterprise in violation of § 16-14-4(b), are the following:

a.     Mail fraud in violation of 18 U.S.C. § 1341;

b.     Wire fraud in violation of 18 U.S.C. § 1343;

c.     Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351;

d.     Visa Fraud in violation of 18 U.S.C. § 1546; and

e.     False Statements and Writings in violation of O.C.G.A. § 16-10-20.

305.   In addition to the racketeering activity described above, Defendants also conspired or endeavored for one or both of them to acquire an interest in money through a pattern of racketeering activity, and one or more of Defendants committed one or more overt acts to effect this objective, in violation of O.C.G.A. § 16-14-4(c).

### *Predicate Acts of Racketeering Activity*

306.   As set forth in the preceding paragraphs, Defendants, through the RICO Enterprise, committed, either individually and/or through the RICO Enterprise, mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; fraud in foreign labor contracting, in violation of 18 U.S.C. §§ 1351; visa fraud in violation of 18 U.S.C. § 1546, and false statements and writings in violation of O.C.G.A. § 16-10-20, through the use of false and fraudulent written offers of employment, instructions on representations to make to acquire a TN visa, Support Letters

submitted to Plaintiffs and other similarly situated and the U.S. Government, and other misrepresentations.

307.   Defendants, through the RICO Enterprise, did or conspired to knowingly and willfully falsify material facts and make false, fictitious, or fraudulent statements or representations regarding the wages Plaintiffs would receive and the work Plaintiffs would perform, as detailed in the Support Letters provided to Plaintiffs, constituting knowing and willful false statements in violation of O.C.G.A. § 16-10-20.

### *Pattern of Related Racketeering Acts*

308.   Defendants engaged in the racketeering activity described in this lawsuit repeatedly, starting during or before January 2021, and continuing through the present.

309.   Each Defendant personally committed at least two acts of racketeering activity, including but not limited to the sending of false and fraudulent writings through the mail and/or wires to Plaintiffs and other similarly situated which were meant to induce them to seek employment that did not exist, and the sending of false and fraudulent writings through the mail and/or wires to the U.S. Government to induce it to grant TN visa status to Plaintiffs and others similarly situated.

310.   Each Defendant participated in the RICO Enterprise directly and/or indirectly through a pattern of racketeering activity, as described above.

311.   Defendants, through the RICO Enterprise, and/or conspiring with the RICO Enterprise, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

312.   Defendants' racketeering acts have had similar purposes: to profit from fraudulent recruitment of Plaintiffs and other foreign workers, and profit from cheap labor in violation of immigration law.

313.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiffs, as outlined below.

314.   As set forth herein, each of the Defendants agreed to and did commit more than two predicate acts of racketeering activity, including, but not limited to:

a.   Sewon directed TESS—and agreed that TESS would—post job offers for employment at the Sewon plant that contained fraudulent misrepresentations regarding non-existent jobs, which Plaintiff Ruiz and others relied upon;

b.   TESS agreed to post job offers for employment at the Sewon plant that contained fraudulent misrepresentations regarding non-existent jobs, which Plaintiffs and others relied upon;

c.   Sewon and TESS interviewed Plaintiffs and others using wires and made fraudulent misrepresentations to them for the purpose of enticing them to apply for employment at Sewon which did not exist and was not eligible for a TN visa;

d.  Sewon and TESS offered employment to Plaintiffs and others on the basis of fraudulent misrepresentations, and sent Plaintiffs and others offer letters containing fraudulent misrepresentations regarding non-existent jobs using mails and/or wires;

e.  Sewon agreed that it and TESS would use the mail and/or wires to send the offer letters containing fraudulent misrepresentations regarding non-existent jobs to Plaintiffs and others;

f.  Sewon and TESS prepared and submitted Support Letters falsely and fraudulently certifying the nature of the jobs being offered and the wages that would be paid to Plaintiffs and others at Sewon;

g.  Sewon provided, and/or agreed to the provision of, the false information contained in the Support Letters for the purpose of defrauding Plaintiffs and the U.S. Government to secure cheap labor in violation of immigration law at the Sewon plant after Plaintiffs obtained TN visas and began working for the companies;

h.  Sewon and TESS submitted the false and fraudulent Support Letters to the U.S. Government for the purpose of defrauding

the U.S. Government and inducing it to issue TN visas to Plaintiffs and others for jobs that did not qualify for the TN visa program;

i.  Sewon's human resources departments had actual knowledge that Plaintiffs and others were permitted to work in the United States only pursuant to TN visas and knowingly hired them for positions that did not qualify for the TN visa program in violation of federal law; and

j.  Sewon authorized, requested, participated in, and recklessly tolerated the fraudulent conduct of TESS to secure cheap labor from Plaintiffs and others in violation of the TN visa program.

### *Injury and Remedies*

315.   As a direct and proximate result of the Defendants' willful, knowing, and intentional acts in violation of Georgia RICO set forth in this Complaint, Plaintiffs and others have suffered injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, incidental relocation expenses, wage underpayments, lost employment opportunities, and/or other pecuniary losses, as well as emotional suffering.

316.   The injuries flowed directly from the Georgia RICO predicate acts which were targeted at Plaintiffs and others members such they were the intended victims: Plaintiffs and others were the foreign workers that Defendants

intentionally defrauded for purposes of securing cheap labor in violation of immigration law.

317.   Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

318.   Plaintiffs and other Recruitment Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

    a.  compensation for their injuries to their property;

    b.  punitive damages;

    c.  trebling of the damages set forth in subparagraph (a) and (b), *supra*; and

    d.  attorneys' and experts' fees and costs associated with this action, as authorized by O.C.G.A. § 16-14-6(c).

**COUNT II**
**Violation of 42 U.S.C. § 1981**
**Class Claim**
*Against Defendant Sewon*

319.   Plaintiffs and the Discrimination Class Members reallege and incorporate all preceding paragraphs as if set forth fully herein.

320.   This Count sets forth claims for damages arising out of Plaintiffs' and others' claims against Sewon under 42 U.S.C. § 1981.

321.    Plaintiffs and the Discrimination Class Members were at all times relevant to this Complaint, parties to contracts, including contracts for the performance of work, in which Plaintiffs and the Discrimination Class members were compensated by Defendant Sewon for their work.

322.    Plaintiffs and the Discrimination Class Members performed their contractual obligations.

323.    Plaintiffs and the Discrimination Class Members are Hispanic or Latino and of Hispanic or Latino ancestry.

324.    Plaintiffs and the Discrimination Class Members are citizens of Mexico.

325.    Plaintiffs and the Discrimination Class Members were subjected to disparate treatment discrimination on the basis of their race and/or ancestry (non-white Hispanic and/or or Latino) by, among other things, being paid less for performing the same work as white and American employees of Defendants and being subjected to mandatory overtime unlike Sewon employees of different races or ancestries.

326.    The above-pled discriminatory conduct toward Plaintiffs and the Discrimination Class Members constitutes unlawful race discrimination against them in violation of 42 U.S.C. § 1981.

327.    Defendants undertook their conduct intentionally and maliciously with respect to Plaintiffs and the Discrimination Class Members and their federally

protected rights, or additionally, and in the alternative, undertook their conduct recklessly with respect to the Plaintiffs and the Discrimination Class Members and their federally protected rights, entitling them to recover punitive damages against Defendants.

328.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and the Discrimination Subclass Members have suffered lost compensation and other benefits of employment, pain and suffering in the form of emotional distress, inconvenience, humiliation, and other indignities.

329.   Plaintiffs and the Discrimination Subclass Members are entitled to damages, including back pay and lost benefits, promotion or a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT III
### Fair Labor Standards Act Violations
### Collective Action Claim
### *Against Defendant Sewon*

330.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

331.   Plaintiffs consent in writing to become party Plaintiffs in this action for claims under the FLSA. (Exhibits 12 & 13).

332.   This count sets forth a claim by Plaintiffs, and by all similarly situated

workers who opt into this action pursuant to 29 U.S.C. § 216(b), for damages resulting from Sewon's violations of the FLSA.

333.   Plaintiffs and other TN visa holders regularly worked more than 40 hours in a single work week.

334.   Sewon's failure to pay Plaintiffs and similarly situated workers one-and-one-half times the correct regular rate of pay for overtime hours, as a result of improper deductions and other violations of the FLSA regulations as described above, violated the overtime provisions of the FLSA.

335.   Sewon's failure to pay Plaintiffs and others the minimum wage as a result of improper deductions and other violations of the FLSA regulations as describe above violated the minimum wage provisions of the FLSA.

336.   Sewon's violations of the FLSA were willful in that they were aware of their obligations regarding overtime and/or minimum wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

337.   Plaintiffs and the other similarly situated TN visa holders are entitled to their unpaid minimum and overtime wages, plus an additional equal amount in liquidated damages, as a consequence of Sewon's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

338.   Plaintiff and the other TN visa holders are also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

339.     Plaintiff and the other TN visa holders also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

**COUNT IV**
**Breach of Contract under Georgia State Law**
**Class Claim**
*Against Defendant Sewon*

340.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

341.     This count sets forth a claim by Plaintiffs and other Recruitment Class members for damages resulting from Defendant Sewon's breaches of contract.

342.     The parties entered into a written contract.

343.     In written offer letters, together with terms provided in the Support Letters, Sewon made written offers of employment to Plaintiffs and the Recruitment Class Members which contained material terms of their employment, including that these jobs would be highly skilled engineer positions paying a certain rate of pay which would be eligible for the TN visa.

344.     Plaintiffs and the Recuirtment Class Members accepted the material terms of employment offered by Defendants in the Support Letters and forbore other opportunities of employment and undertook certain expenses in exchange for that employment as offered.

345.     Defendants did not provide employment to Plaintiffs and the Recruitment Class Members as offered, but rather, provided manual labor jobs on

its production line which were not eligible for TN visas, for wages that were lower than the wage promised in the support letters.

346.   Defendants thus breached their contracts with Plaintiffs and the Recruitment Class Members.

347.   As a result, Plaintiffs and other Recruitment Members incurred incidental and consequential damages which they are entitled to recover at law, including but not limited to visa processing fees, unreimbursed travel expenses, relocation expenses, wage underpayments, and lost employment opportunities, and nominal damages.

348.   Also, Plaintiffs and other Recruitment Class Members are entitled to recover nominal damages for Defendants' breach of these contracts.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all triable issues and seeks judgment as follows:

a.   assuming jurisdiction over this action;

b.   certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as counsel for the Classes;

c.   declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiffs to provide notice of

this action to potential opt-in plaintiffs, and allowing those eligible

TN visa holders who choose to do so to opt into this action;

d.　declaring that Defendants violated Georgia RICO;

e.　declaring Sewon violated Section 1981;

f.　declaring Sewon violated the FLSA;

g.　declaring Defendant Sewon breached contracts of employment with

Plaintiffs and applicable Class members;

h.　permanently enjoining Defendants from further violations of Georgia

RICO;

i.　permanently enjoining Sewon from further violations of Section 1981

and the FLSA;

j.　granting judgment to Plaintiffs and other Recruitment Subclass

members, and against all Defendants, on Plaintiffs' and other

Recruitment Subclass members' Georgia RICO claims and awarding

them the trebled amount of their pecuniary losses;

k.　granting judgment to Plaintiffs and other Recruitment Subclass

members, and against all Defendants, on Plaintiffs' and other

Recruitment Subclass members' Georgia RICO claims and awarding

them the trebled amount of their pecuniary losses and punitive

damages;

l.     granting judgment to Plaintiffs and other Recruitment Subclass members, and against all Defendants, on Plaintiffs' and other Recruitment Subclass members' Georgia contract claims and awarding them compensatory and punitive damages;

m.    granting judgment to Plaintiffs and other Discrimination Subclass members and against Defendant Sewon pursuant to Section 1981 and awarding punitive damages;

n.     granting judgment to Plaintiffs and other similarly situated TN visa holders who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims, and against Sewon and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

o.     Awarding Plaintiffs and other Class members prejudgment and post-judgment interest as allowed by law;

p.     Awarding Plaintiffs and other Class members their costs and reasonable attorneys' fees; and

q.     Granting such further relief as the Court finds just.

## JURY DEMAND

Plaintiffs, individually and on behalf of the Classes hereby demand a trial by jury as to all issues so triable.

Respectfully submitted this day: March 15, 2024.

BEAL, SUTHERLAND,
BERLIN & BROWN, LLC

*/s/ Brian J. Sutherland*
Brian J. Sutherland
Georgia Bar No. 105408
brian@beal.law
Rachel Berlin Benjamin
Georgia Bar No. 707419
rachel@beal.law
2200 Century Parkway NE
Suite 100
Atlanta, GA 30345
Telephone: (678) 439-0330

ELARBEE, THOMPSON,
SAPP & WILSON, LLP

*/s/ Justin Connell*
Justin B. Connell
Georgia Bar No. 142692
connell@elarbeethompson.com
Andrew C. Suarez
Georgia Bar No. 895071
suarez@elarbeethompson.com
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
Telephone: (404) 659-6700

*Attorneys for Plaintiffs*